ORIGINAL

FILED
JAN 3 0 2004
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE UNITED ILLUMINATING COMPANY, Plaintiff, | ) | No. 04-0129C |
| v. | ) | |
| UNITED STATES OF AMERICA, Defendant, | ) | |

COMPLAINT

1. This is an action for just compensation by Plaintiff, The United Illuminating Company ("UI"), against Defendant, the United States of America, acting by and through the U.S. Department of Energy ("DOE"), for uncompensated taking in violation of the Fifth Amendment to the U.S. Constitution caused by DOE's failure to meet its obligations under the Nuclear Waste Policy Act of 1982 ("NWPA" or "Act"), as amended, 42 U.S.C. §§ 10101 *et seq.*, to begin removal and disposal of Spent Nuclear Fuel and high-level nuclear waste ("SNF") at the Seabrook Nuclear Generating Station Unit 1 ("Seabrook") and the Millstone Station Unit 3 ("Millstone 3").

2. UI owned or leased (pursuant to a sale/leaseback agreement) a 17.5% interest in Seabrook. On November 1, 2002, UI sold its interest in Seabrook to FPL Energy Seabrook, LLC.

3. UI owned a 3.685% interest in Millstone 3. On March 31, 2001, UI sold its interest in Millstone 3 to Dominion Resources, Inc. ("Dominion").

4. Pursuant to NWPA, DOE was required to commence accepting and permanently disposing of SNF by January 31, 1998 in return for payments by nuclear plant owners into a Nuclear Waste Fund. By the closing dates of UI's sales of Seabrook and Millstone 3, UI's payments of fees into the Nuclear Waste Fund for both plants totaled approximately $21.2 million. DOE did not begin to take custody or dispose of UI's SNF by January 31, 1998, or by the closing dates of UI's sales of Seabrook and Millstone 3. By the closing dates of UI's sales of Seabrook and Millstone 3, there was no prospect that DOE would take custody or dispose of SNF from the facilities in the foreseeable future because DOE had not then (and has not to this day) sited, licensed, constructed, or placed in operation an SNF disposal facility, or made provisions for the temporary storage of SNF until such time as a permanent SNF facility becomes available.

5. As a direct and proximate result of DOE's failure to meet its statutory obligations to begin to accept and remove SNF on January 31, 1998, UI suffered substantial economic harm including a significant reduction in the fair market values of Seabrook and Millstone 3. UI realized significantly less value in the sales of Seabrook and Millstone 3 than it would have received had DOE properly fulfilled its statutory obligations. The values of Seabrook and Millstone 3 were significantly diminished when it became apparent that DOE would not begin accepting and removing SNF by January 31, 1998. This diminishment continued beyond this deadline as DOE's statutory violation continued with no SNF disposal solution in sight. This caused potential buyers significantly to reduce their price to account for the increased risk associated with the uncertain life expectancies of Seabrook and Millstone 3 and the anticipated capital expenses associated with storing SNF indefinitely.

6. UI also incurred significant costs associated with the interim storage of its SNF up to the closing dates of its sales of Seabrook and Millstone 3, including additional capital expenses and related operation and maintenance expenses. These costs would not have been incurred had DOE began the acceptance and removal of SNF by January 31, 1998 as required. Accordingly, UI was deprived of the full economic value of its property.

7. UI's case is distinguishable from the SNF case presently before this Court. Those cases have been filed predominantly by the existing owners/operators of the nuclear facilities seeking damages related to on-going SNF storage costs. By contrast, as a seller of nuclear-generating assets, UI's Complaint seeks just compensation associated with the diminished fair market value of Seabrook resulting from DOE's failure to meet its obligations under the Act, as well as other related costs incurred up to the closing date of the sale. Unlike the existing owner/operator cases, UI's just compensation is fixed and readily ascertainable as of the closing date of its sales transactions.

## JURISDICTION

8. This court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1491(a)(1).

## PARTIES

9. Plaintiff UI is a specially chartered Connecticut corporation regulated by the Federal Energy Regulatory Commission ("FERC") and the (Connecticut) Department of Public Utility Control ("DPUC") with respect to certain of its assets (such as Seabrook and Millstone 3).

10. UI is a Connecticut corporation and is a subsidiary of UIL Holdings, a Connecticut corporation. UI is engaged principally in the purchase, transmission, distribution and sale of electricity.

11. Defendant is the United States of America, acting by and through DOE.

12. For more than fifty years, the federal government systematically acted to induce electric utilities, including UI, to invest in nuclear technology on the promise, both implied and explicit, that key issues affecting utilities' adoption of the technology would be resolved in a timely and economic manner. Among the promises of the federal government was that it would adequately provide for assuming custody and disposal of SNF. UI relied on these representations and made substantial capital investments in the construction of Seabrook in order to support Seabrook's continued operation.

13. On December 8, 1953, President Dwight D. Eisenhower announced to the United Nations his intent to employ nuclear materials "to provide abundant electrical energy in the power-starved areas of the world." Dwight D. Eisenhower, Address Before the General Assembly of the United Nations on Peaceful Uses of Atomic Energy, New York City (Dec. 8, 1953), *in Public Papers of the Presidents: Dwight D. Eisenhower* ¶ 256, at 821 (1953). The Atomic Energy Act of 1954 was subsequently passed on August 30, 1954. Notably, the Atomic Energy Act instructed the U.S. Atomic Energy Commission ("AEC"), the predecessor agency to the Nuclear Regulatory Commission ("NRC"), to encourage commercial development and use of nuclear energy, and to issue licenses to private companies to build and operate nuclear power stations.

14. Guided by the Atoms for Peace initiatives, the AEC announced the "Power Reactor Demonstration Program" in January 1955 with the objective of encouraging and supporting the commercial development of nuclear power.

15. In 1959, six years following President Eisenhower's Atoms for Peace speech, it was becoming clear that the then-current levels of federal promotion of commercial nuclear power plant construction were not sufficient to move the technology toward wider commercialization. In March 1962, President John F. Kennedy asked AEC Chairman Glenn Seaborg to report on the role of nuclear power in the country. Notably, Chairman Seaborg urged the President to continue to encourage and support the commitment of electric utilities to nuclear generation.

16. Throughout this period, the federal government continued to represent that it would provide mechanisms for SNF storage and disposal, among which would be the continued utilization of nuclear fuel reprocessing. Consequently, electric utilities, including UI, designed, and the AEC (and subsequently the NRC) licensed and approved for operation, nuclear power facilities with SNF pools intended only for temporary storage and for only a fraction of the plants' forty-year license lives.

17. In 1976, President Gerald R. Ford announced a moratorium on reprocessing SNF consistent with new arms control initiatives. This moratorium coincided with a surge in the number of commercial operating reactors entering service. Whereas reprocessing had previously been expected to limit the growth of SNF inventories at commercial nuclear power reactor sites, in the absence of reprocessing, the inventory of SNF at reactor sites began to rapidly increase until the limited, temporary storage capacity of the SNF pools at these plants was consumed.

18. In 1977, President Jimmy Carter announced that SNF would be transferred to a federally approved "away from reactor" facility for storage until a federal government repository became available. President Carter said the federal government would charge a one-time fee for storage. The President also established the Interagency Review Group on Nuclear Waste Management ("IRG"). IRG issued its findings in 1979, which proposed, among other things, that the federal government construct and operate a repository for permanent SNF disposal by the early 1990s.

THE NUCLEAR WASTE POLICY ACT OF 1982

19. NWPA was signed into law by President Ronald Reagan in January 1983. 42 U.S.C. § 10101 *et* seq. Passage of NWPA represents the government's acceptance of responsibility for the disposal of SNF. Congress passed NWPA to address and ameliorate the accumulation of SNF from nuclear reactors, and to fulfill the federal government's long-standing policy of assuming responsibility for the disposal of SNF. Recognizing that reprocessing of SNF was not a viable alternative to disposal of SNF, Congress created the Act "to establish programs for the development of repositories for the safe permanent disposal of high level nuclear waste and spent fuel." H.R. Rep. No. 97-491, pt. 1, at 26 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3792, 3792. Congress also made clear that time was of the essence and made the disposal of SNF an immediate federal priority:

> The failure of the government to provide a permanent waste disposal facility during more than 30 years of Federal nuclear activities is unmitigated.... Failures in the Federal repository development program, the collapse of the domestic spent fuel reprocessing industry and quickly deteriorating public confidence in our ability to deal safely with nuclear waste, together with other critical safety and economic issues, were seriously undermining the strength of the domestic nuclear industry.

*Id.* at 28, 1982 U.S.C.C.A.N. at 3794.

20. The purpose of NWPA was, among other things, to establish a schedule for the location, construction, and operation of repositories for the disposal of SNF, and to initiate ownership and custody of SNF by the federal government at a permanent disposal facility beginning in January 1998. Thus, NWPA established the federal government's exclusive responsibility for the disposal of SNF beginning in January 1998.

21. Pursuant to the Act, DOE was obligated to fulfill three primary tasks: (1) conduct an annual review of the fees imposed on facilities and determine if the revenues associated therewith would be sufficient to cover the costs associated with SNF disposal activities taken pursuant to the Act (42 U.S.C. § 10222(a)(4)); (2) begin disposal of SNF no later than January 31, 1998 *(id.* § 10222(a)(5)); and (3) establish a schedule for locating, constructing, and operating repositories for SNF disposal, including publishing written criteria that set forth the terms and conditions by which DOE would make disposal services available to utilities *(id.* §§ 10131(b)(1), 10222(a)(6)).

22. NWPA vested DOE with the sole authority to accept title to, transport, and dispose of SNF. The Act authorized DOE to contract with utilities and other producers of high-level nuclear waste to collect and take custody of SNF.

23. On April 18, 1983, DOE codified the "Standard Contract" in the Code of Federal Regulations at 10 C.F.R. § 961.11. Consistent with NWPA, the Standard Contract provides that DOE would begin acceptance of SNF no later than January 31, 1998 in return for a one-time fee for pre-1983-generated nuclear waste, as well as for an on-going fee assessed by DOE against

SNF generators. The fee was initially set at 1.0 mill per kilowatt hour (1 mil/kwh) of electricity generated and sold by Standard Contract holders.

24. UI was subject to NWPA and was a party to the Standard Contract via its ownership interests in Millstone 3 pursuant to the actions of its agent, the Northeast Utilities Service Company, in DOE Contract No. DE-CR-01-83NE44468.000, and via its ownership interests in Seabrook pursuant to the actions of its agent, the New Hampshire Yankee Division of the Public Service Company of New Hampshire, in DOE Contract No. DE-CR01-86RW00111.

25. The fees paid by all nuclear waste generating entities pursuant to the Act were intended to fund DOE's development and implementation of a national SNF disposal facility and program as contemplated by Congress. All such fees were, and continue to be, paid into a Nuclear Waste Fund by the owners of nuclear waste generating facilities. Since its inception, producers of nuclear generated power nationwide have paid, directly and through earned interest, in excess of $19 billion into the Nuclear Waste Fund.

26. As a minority owner of Seabrook, UI paid approximately $17.7 million into the Nuclear Waste Fund up to the closing date of the sale of its interest in this plant for the removal of its SNF.

27. As a minority owner of Millstone 3, UI paid approximately $3.5 million into the Nuclear Waste Fund up to the closing date of the sale of its interest in this plant for the removal of its SNF.

28. On May 18, 1998, DOE announced an expenditure plan for the nuclear waste disposal program through 2010 (the "1998 DOE Plan"). The 1998 DOE Plan recognized that DOE would be unable to meet its statutory and contractual obligations to begin removal and disposal of SNF

until 2010 at the earliest. However, the 1998 DOE Plan indicated that DOE intended to continue to collect the 1 mil/kwh fee through 2010, which would produce an annual aggregate payment into the Nuclear Waste Fund of approximately $600 million, as contrasted with the 1998 DOE Plan's anticipated annual expenditures of $340 million. The 1998 DOE Plan states that total fees collected from 1983 through 1998, less program expenditures, yielded a positive fund balance of approximately $8 billion, nearly twice the amount necessary to fully fund DOE's anticipated program expenditures through 2010 without any additional fee collections. Nevertheless, DOE continued to collect the 1 mil/kwh fee and does so to this day.

29. NWPA obligated DOE to collect by January 31, 1998 all fees necessary to place in operation a permanent national nuclear waste repository. DOE was obligated to periodically review the fund balance and to propose any adjustment to the 1 mil/kwh fee to accomplish the objectives of NWPA. Since the initiation of the 1 mil/kwh fee approximately twenty years ago, DOE has not adjusted the fee, notwithstanding that the current balance and continued collection of the fee will result in a significant over-funding of the program.

30. DOE's imposition of continuing fee payments adversely affected the market values of Seabrook and Millstone 3. On information and belief, prospective buyers of nuclear-generating plants, including those for Seabrook and Millstone 3, factored the continuing fee payments into their valuation models and reduced their purchase prices accordingly.

31. Pursuant to both the Act and the Standard Contract, DOE was required to begin accepting nuclear waste by a date certain-January 31, 1998-in consideration of the payments received by DOE. The Standard Contract provides that "[t]he services to be provided by DOE under this

contract shall begin, after commencement of facility operations, not later than January 31, 1998 and shall continue until such time as all SNF has been disposed of." 10 C.F.R. § 961.11, Art. II.

32. Utilities and other producers of SNF, including UI, have been required to pay all of the costs associated with the SNF disposal program. Since its inception, producers of nuclear-generated power nationwide have paid, directly and through earned interest, in excess of $19 billion into the Nuclear Waste Fund.

33. Execution of the Standard Contract was mandatory for generators of high-level nuclear waste. NWPA provided that commercial nuclear plant owners or operators seeking an operating license from the Nuclear Regulatory Commission ("NRC") shall not have such license issued or renewed to them by NRC unless these owners or operators have signed the Standard Contract. 42 U.S.C. § 10222(b)(1)(A). NWPA also requires that holders of nuclear-generating licenses issued by the NRC shall not be entitled to dispose of SNF either through DOE's federal repository program or through any other means or facility, without first having executed the Standard Contract.

34. As a minority owner of Seabrook and Millstone 3, UI was an intended beneficiary of the Standard Contracts for Seabrook and Millstone 3. As such, UI has fully and timely complied with all of the requirements of NWPA and the Standard Contract, including paying approximately $21.2 million into the Nuclear Waste Fund. DOE, however, did not begin acceptance of UI's SNF by January 31, 1998, as required by NWPA and the Standard Contract. DOE has not commenced removal of the SNF at Seabrook or at any of the country's nuclear facilities to this day.

DOE'S FAILURE TO COMPLY WITH ITS STATUTORY OBLIGATIONS

35. In the two decades since the enactment of NWPA, DOE has failed to develop and implement the SNF disposal program that Congress defined as a "national priority."

36. In 1987, Congress designated Yucca Mountain, Nevada as the only candidate site eligible for permanent status as a repository to store high-level radioactive waste and SNF. DOE was obligated to develop a schedule for the construction and operation of the Yucca Mountain repository and publish terms and conditions for acceptance and removal of SNF that are compliant with NWPA 42 U.S.C. §§ 10131(b)(1), 10222(a)(6).

37. Despite its express statutory obligations, DOE failed to timely adhere to many of the requirements established by NWPA. These failures had a significant negative impact on DOE's ability to adhere to a program schedule, particularly as it related to the establishment of a geological repository for the disposal of SNF. Nevertheless, DOE continued to assess and collect Nuclear Waste Fund fees from nuclear generators of SNF, including UI.

38. Through at least 1995, DOE represented that it would begin to accept SNF by the statutory deadline of January 31, 1998. Although DOE knew it was falling behind schedule, it did not develop contingency plans to meet the January 31, 1998 deadline.

39. In 1995, DOE published a "Final Interpretation of Nuclear Waste Acceptance Issues" ("Final Interpretation") in the Federal Register. The Final Interpretation purported to disclaim DOE's obligations under NWPA (and the Standard Contract), stating that DOE was not obligated to begin accepting SNF by January 31, 1998 because it did not have an SNF repository.

40. Several nuclear generators sought review of the Final Interpretation in the U.S. Court of Appeals for the District of Columbia Circuit. The D.C. Circuit held that NWPA imposed an

unconditional obligation on DOE to begin accepting SNF on or before January 31, 1998. *Ind. Mich. Power Co. v. Dep't of Energy,* 88 F.3d 1272 (D.C. Cir. 1996). The court found that DOE's obligations were reciprocal to the obligation of the nuclear generators to pay fees into the Nuclear Waste Fund. The court rejected DOE's Final Interpretation and stated:

> DOE's duty under subsection (B) to dispose of the SNF is conditioned on the payment of fees by the owner and is triggered, at the latest, by the arrival of January 31, 1998. Nowhere, however, does the statute indicate that the obligation established in subsection (B) is somehow tied to the commencement of repository operations referred to in subsection (A).... Under the plain language of the statute, the utilities anticipated paying fees "in return for [which] the Secretary" had a commensurate duty. She was to begin disposing of the high-level radioactive waste or SNF by a day certain.

*Id.* at 1276.

41. Notwithstanding the court's ruling, in late 1996, DOE, for the first time, officially acknowledged in letters sent to all Standard Contract holders that it would not meet the statutory and contractual deadline of January 31, 1998 to begin acceptance and removal of SNF from the nation's nuclear facilities. DOE maintained that its failure to meet the statutory January 31, 1998 deadline was excused because its delay was "unavoidable."

42. As a result, several nuclear facility owners filed a petition for a writ of mandamus to compel DOE to comply with the court's earlier mandate in *Indiana Michigan. Northern States Power Co. v. United States Dep't of Energy,* 128 F.3d 754 (D.C. Cir. 1997). The D.C. Circuit reiterated DOE's unconditional statutory obligation to begin accepting SNF on or before January 31, 1998 and issued a writ of mandamus barring DOE from asserting that its failure to meet the January 31, 1998 deadline was unavoidable:

> [T]he Department has endeavored to proceed according to Article IX of the Standard Contract, by first informing the parties of its

> anticipated delay, and then evaluating whether its own delay is "unavoidable." Article IX describes an unavoidable delay as a party's "failure to perform its obligations...aris[ing] out of causes beyond the control and without the fault or negligence of the party failing to perform."...As we pointed out in *Indiana Michigan,* the NWPA directs DOE to undertake the duty to begin taking the SNF by January 31, 1998, whether or not it has a repository or interim storage facility. DOE cannot now render its obligation contingent, and free itself of the costs caused by its delay, by advancing the same failed position we rejected before.

*Id.* at 759-60.

43. On January 31, 1998, DOE failed to begin accepting SNF as required by NWPA. Despite conducting congressionally mandated activities pursuant to NWPA for nearly fifteen years and spending in excess of $4.5 billion from the Nuclear Waste Fund by the time a site was required to be operational, DOE had failed to construct and operate an SNF repository by January 31, 1998. Instead, DOE now insists that it will not have an operational facility at Yucca Mountain until 2010, at the earliest. DOE's latest estimate notwithstanding, and contrary to the express requirements of NWPA, DOE has not established a meaningful or realistic schedule or determined a date certain by which a permanent repository will be operational. Neither had DOE offered an interim plan for the storage of SNF by the time UI closed the sales of Seabrook and Millstone 3, nor has such a schedule been established to this day. Notwithstanding these failures to meet its SNF-related obligations, DOE continued (and continues) to assess and collect the 1 mil/kwh fee.

44. In 2000, the U.S. Court of Appeals for the Federal Circuit ruled that DOE's failure to begin acceptance of SNF by January 31, 1998 amounted to a violation of the Act (and a breach of the Standard Contract), and that the U.S. Court of Federal Claims ("COFC") was an appropriate forum for such claims against DOE. *See Maine Yankee Atomic Power Co. v. United*

*States,* 225 F.3d 1336 (Fed. Cir. 2000); *Northern States Power Co. v. United States,* 224 F.3d 1361 (Fed. Cir. 2000). The court stated, in pertinent part:

> In brief, we hold that the unavoidable delays provision [in the Standard Contract] deals with delays arising after performance of the contract has begun, and does not bar a suit seeking damages for the government's failure to begin performance at all by the statutory and contractual deadline of January 31, 1998.

*Northern States Power,* 224 F.3d at 1367.

45. To date, 29 cases have been filed in the COFC against DOE related to its failure to meet its obligations under the NWPA and the Standard Contract, predominately by the existing owner/operators of nuclear facilities seeking damages related to on-going SNF storage costs. By contrast, as a seller of a nuclear facility, UI is seeking just compensation for the government's wrongful taking which caused substantial economic harm to UI, including significant reductions in the values of Seabrook and Millstone 3 and other related costs incurred up to the closing dates of the sales.

## SEABROOK STATION

46. Seabrook is located in Seabrook, New Hampshire. Construction on Seabrook commenced in July 1976, and the NRC issued the operating license for Seabrook on March 15, 1990. Commercial operations at Seabrook commenced in June 1990. A second unit (Seabrook Unit 2) was originally intended for the site, but construction of Unit 2 was never completed. Seabrook has a nominal generating capacity of 1,155 MWs, and UI's share of this capacity is equivalent to 202.125 MWs.

47. As Seabrook was subscribed, financed, designed, and partially constructed prior to the enactment of NWPA, all SNF produced at Seabrook was expected to be shipped off-site for

reprocessing periodically. As a result, the need for significant on-site storage capacity was not contemplated. With the adoption of NWPA, and the elimination of SNF reprocessing, UI was compelled to rely on the federal government to accept and dispose of its SNF in accordance with the Act.

## MILLSTONE 3 STATION

48. Millstone 3 is located in Waterford, Connecticut. Construction on Millstone 3 commenced on August 9, 1974, and the NRC issued the operating license for Seabrook on January 31, 1986. Commercial operations at Millstone 3 commenced on April 23, 1986. Millstone 3 has a nominal generating capacity of 1,154 MWs, and UI's share of this capacity is equivalent to 42.5 MWs.

49. As Millstone 3 was subscribed, financed, designed, and partially constructed prior to the enactment of NWPA, all SNF produced at Millstone 3 was expected to be shipped off-site for reprocessing periodically. As a result, the need for significant on-site storage capacity was not contemplated. With the adoption of NWPA, and the elimination of SNF reprocessing, UI was compelled to rely on the federal government to accept and dispose of its SNF in accordance with the Act.

## SALE OF SEABROOK

50. In 1998, the Connecticut General Assembly enacted a law (P.A. 98-28, relevant parts of which were subsequently codified at C.G.S. §§ 16-244f and 16-244g) that provided for competition in the electric supply marketplace and required, as a condition of obtaining recovery of stranded costs, that electric companies, including UI, divest their non-nuclear generation assets and submit their nuclear generation assets to public auction.

51. In response to P.A. 98-28, UI determined to offer Seabrook for sale through a competitive auction. Four potentially qualified bidders expressed an interest in participating in the auction.

52. On April 13, 2002, UI and several other owners (comprising 88.2% of the ownership interests in Seabrook) entered into a Purchase and Sale Agreement with FPL Energy Seabrook for the sale of their respective interests in Seabrook, which subsequently received all requisite state and federal approvals to effectuate the sale.

SALE OF MILLSTONE 3

53. Also in response to P.A. 98-28, UI determined to offer Millstone 3 for sale through a competitive auction. No more than half a dozen potentially qualified bidders expressed an interest in participating in the auction.

54. On August 7, 2000, UI and several other owners (comprising approximately 92.4% of the ownership interests in Millstone 3) entered into a Purchase and Sale Agreement with Dominion for the sale of their respective interests in Millstone 3, which subsequently received all requisite state and federal approvals to effectuate the sale.

JUST COMPENSATION DUE UI

55. DOE's failure to commence acceptance and disposal of SNF on January 31, 1998 significantly diminished the values of Seabrook and Millstone 3. When Seabrook and Millstone 3 were divested, these diminished values were reflected in the auction processes, and ultimately in the terms and conditions of sale for otherwise extremely valuable electric generating assets. DOE's failure to fulfill its mandates under NWPA and the Standard Contract directly resulted in such prospective purchasers, as were actually willing to entertain acquisition of nuclear electric

generating facilities such as the Nuclear Stations, to account for the increased costs, risks, and uncertainties brought about by DOE in their respective valuation of the assets.

56. As a direct and proximate result of DOE's failure to perform its statutory and contractual obligations, UI suffered significant damages. These damages fall into two general categories, namely: (a) significant diminution in the market values for Seabrook and Millstone 3 that caused UI to realize significantly less value in the sales of Seabrook and Millstone 3 than would have been the case had DOE met its obligations under NWPA and the Standard Contract; and (b) increased costs and expenditures incurred by UI up to the closing date of UI's sales of Seabrook and Millstone 3 to store and maintain SNF, and other related costs.

57. The market values of Seabrook and Millstone 3 prior to DOE's failure to meet its statutory obligations under NWPA were significantly greater than they were immediately following that failure, and at the time of UI's sales of Seabrook and Millstone 3. This diminution in market value was a direct and proximate result of DOE's failure to fulfill its NWPA statutory mandates.

58. Indicative of the decreased market value, UI's compensation for the sales of Seabrook and Millstone 3 was substantially less than it would have been had DOE fulfilled its statutory obligations to begin acceptance and removal of SNF commencing on January 31, 1998. DOE's failure to perform its statutory obligations under NWPA caused the market opportunities for nuclear-generating facilities, such as Seabrook and Millstone 3, to be artificially constrained, thereby reducing the beneficial effects of a competitive auction for these assets. At the time of the sales of Seabrook and Millstone 3, DOE had not provided a commitment to the nuclear-generating industry as to when, if ever, it would begin accepting SNF. Potential buyers bid less

in the sales processes for Seabrook and Millstone 3 due to the increased risk and anticipated expense associated with storing SNF on-site indefinitely. This diminished the fair market value of Seabrook. Had DOE properly performed its statutory obligations under the Act, more bidders would have competed in the sales of Seabrook and Millstone 3, which would have enhanced competition and resulted in higher prices being realized for Seabrook and Millstone 3.

59. Pursuant to NWPA, DOE was entitled to assess and collect (and nuclear-generating facility owners such as Seabrook and Millstone 3 were obligated to pay) only such fees as were authorized by NWPA. By the time of the sales transactions for Seabrook and Millstone 3, it was evident to potential buyers that DOE intended, and had already begun, to disregard the fee provisions of NWPA and instead to assess and collect amounts in excess of those authorized by NWPA. The 1998 DOE Plan made it clear that DOE intended to continue the over-collection of fees indefinitely. However, NWPA did not authorize DOE: a) to collect amounts to support DOE's breach of its obligations well into the 21st Century; b) to anticipate its liability as would ultimately be determined by the Courts and to pre-collect such amounts; c) to pre-collect funds to repay or support operations damaged by DOE's failure to remove SNF; or d) to collect from and assign to companies, such as UI, cost responsibility for DOE's cost overruns associated with a noncompliant and significantly delayed waste disposal program. Notwithstanding this lack of authorization, DOE engaged in just such activities, which deprived UI of the value of its assets, and, contrary to the provisions of NWPA, improperly required UI to suffer the financial consequences of DOE's unauthorized actions.

60. The market values for Seabrook and Millstone 3 also were significantly diminished by DOE's failure to meet its statutory obligations under NWPA because the buyers, FPL Energy

and Dominion, significantly reduced their prices to account for the increased risks and costs associated with indefinite SNF on-site storage and the anticipated post-closing costs to store SNF and continue to operate the plants.

## COUNT I

## UNCOMPENSATED TAKING

61. UI repeats and re-alleges here all the allegations as set forth in paragraphs 1 through 60 above.

62. DOE was unconditionally obligated under NWPA to begin the process of acceptance of UI's SNF by January 31, 1998. NWPA conferred upon UI a right to have the DOE dispose of UI's SNF in a manner and at a cost consistent with the intent of Congress.

63. DOE's failure to dispose of UI's SNF by January 31, 1998 as required by the Act deprived UI of the full use and value of its nuclear facilities, caused it to incur substantial unnecessary capital and other expenses, and severely diminished the value of these facilities. This failure constitutes a taking of UI's vested property rights without just compensation.

64. UI possessed a protected property interest in the benefits of NWPA, including paying into the Nuclear Waste Fund only what the statute authorizes. DOE's disregard of this interest and its continued collection after January 31, 1998 of amounts in excess of those authorized by NWPA resulted in a systematic and unreasonable over-collection of those fees. This action constitutes a taking of UI's property in violation of the Fifth Amendment to the U.S. Constitution.

65. In the alternative, UI was an intended beneficiary of the Standard Contract at all relevant times prior to and including January 31, 1998. Under the Standard Contract, DOE was obligated to accept and/or dispose of UI's SNF. Accordingly, as an intended beneficiary to the Standard Contract, UI possessed property rights to have the DOE dispose of UI's SNF in a manner and at a cost consistent with the express terms of the Standard Contract. DOE's failure to commence taking custody of UI's SNF by January 31, 1998 as required by the Standard Contract, deprived UI of the full use and value of its nuclear facilities, caused it to incur substantial unnecessary capital and other expenses, and severely diminished the value of these facilities. This failure constitutes a taking of UI's vested property rights without just compensation. Moreover, DOE's actions in continuing to collect Nuclear Waste Fund payments from utilities, including UI, beyond that which was necessary to put a permanent national nuclear waste repository in place by January 31, 1998 constitutes a further taking of UI's property rights.

66. DOE's failure to abide by its statutory obligations with respect to SNF has destroyed UI's reasonable, investment-backed expectations arising from NWPA. DOE's conduct has deprived UI of the full economic use of its nuclear facilities and related property, and reduced the tangible and intangible values of Seabrook and Millstone 3 as a going concern.

67. DOE's failure to perform its statutory responsibilities were clearly aimed at, and intended to benefit, the general public's interest at the expense of UI. DOE was obligated to undertake the exercise of proper procedures to ensure due process and the calculation of just compensation from the date of taking. DOE failed to exercise those procedures and failed to provide just compensation.

68. By reason of the foregoing, DOE has taken UI's property in violation of the Fifth Amendment to the U.S. Constitution and is liable to UI for just compensation.

## PRAYER FOR RELIEF

WHEREFORE, UI respectfully requests that the Court enter judgment in its favor and against the United States as follows:

(1) On Count I, for just compensation in an amount to be established at trial;

(2) Pre-judgment and post-judgment interest as permitted by law;

(3) Costs of suit, including reasonable attorneys' fees, as permitted by law; and

(4) Such other and further relief as this Court may deem proper.

Date: January 29, 2004

Respectfully submitted,

Shaun S. Sullivan
Jonathan M. Freiman
Wiggin and Dana LLP
P.O. Box 1832
One Century Tower
New Haven, CT 06508-1832
Tel: 203-498-4400
Fax: 203-782-2889

*Counsel of Record for Plaintiff*
*The United Illuminating Company*